IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ELAINE L. CHAO, Secretary of Labor, ) | |
| U.S. Department of Labor, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:04CV00854 |
| ) | |
| TERRY RHOADES and WESLEY ) | |
| WALKER, ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

**Sharp, Magistrate Judge**

Plaintiff Elaine L. Chao, Secretary of Labor ("the Secretary"), alleges that Defendants Terry Rhoades and Wesley Walker violated their fiduciary duty to participants in a simple IRA plan ("the Plan") governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). In defense, Walker contends that he is not a "fiduciary" within the meaning of ERISA and therefore cannot be found liable for the loss sustained by the Plan.

The matter came before the Court on March 21, 2006 for a bench trial.[1] Shortly before trial, Defendant Rhoades stipulated to his liability as a fiduciary, and the Court signed a Consent Order establishing Rhoades' liability in the amount of $29,565.25 plus post-

---

[1] The parties have consented to the trial jurisdiction of the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c).

judgment interest. At the close of trial on March 22, 2006, the Court took the matter of Walker's liability under consideration. The Court has now considered all of the trial evidence and, pursuant to Rule 52 of the Federal Rules of Civil Procedure, makes the following findings of fact and conclusions of law.

**Findings of Fact**

1.  WAR Enterprises, Inc. ("WAR") was established in 1998 as a North Carolina corporation with its principal place of business in Winston-Salem, North Carolina. WAR operated under the names Server Solutions and Entegrait.

2.  Wesley Walker served, at various times, as the President and Chief Executive Officer of WAR. He was a member of the Board of Directors and an original 50% shareholder.

3.  Terry Rhoades served as the Chief Financial Officer of WAR and was a member of the Board of Directors and an original 50% shareholder.

4.  In 1999, Walker, Rhoades, and another board member, George Lothian, established a simple IRA plan for WAR employees.

5.  WAR was the Plan sponsor and the employer of all Plan participants.

6.  Terry Rhoades was assigned responsibility for financial matters at WAR, including processing of payroll and administration of the Plan. Walker worked on the "client" and marketing side of the business.

-2-

7. Both Walker and Rhoades had authority to sign checks on WAR's general account, and Walker authorized the use of his electronic signature on checks drawn on WAR's account.

8. Under the Plan, WAR employees could elect to defer a portion of their wages for contribution into a simple IRA account.

9. The Plan was to be funded by voluntary employee contributions withheld from payroll, as well as certain employer matching contributions.

10. During 1999, WAR's three board members, Walker, Rhoades and Lothian, were the only participants in the Plan.

11. Beginning in 2000, at least nine other employees elected to participate in the Plan by deferring part of their earnings. Subsequently, additional employees joined the Plan while others withdrew from the Plan.

12. Walker never reviewed WAR's records or his IRA account statements to determine whether employee contributions were being forwarded to the Plan. Walker reasonably believed that all duties regarding administration of the Plan had been delegated to Rhoades. Rhoades fully understood and accepted this delegation.

13. WAR remitted one payment to the custodial trustee of the IRA accounts on behalf of Walker, Rhoades and Lothian on June 21, 1999, totaling $345.00.

14. After June 21, 1999, payroll deductions were made but the funds were not segregated from other company assets and were not forwarded to the custodial trustee.

15. Employee contributions were not forwarded to the custodial trustee because Rhoades, without consulting Walker or the Board, unilaterally decided not to fund the Plan. It was solely his responsibility to make the IRA payments, and he chose not to do so, apparently in view of cash flow problems at WAR.

16. By at least early 2000, WAR was unable to meet all of its financial obligations.

17. Rhoades, as financial officer, created records and balance sheets and took other measures that had the effect of grossly overstating the strength of the company's financial condition. Neither Walker nor the Board were aware in 2000 or before May 2001 that WAR was in a precarious financial condition or that employee IRA contributions were not being forwarded in accordance with the Plan.

18. On or about May 18, 2001, Walker learned from Rhoades for the first time that the company was delinquent in payroll taxes and that the Plan was at least partially unfunded. Rhoades apologized to Walker and told him that the company was in serious financial trouble, despite his earlier favorable financial reports. The Court credits the testimony of Walker that he had no knowledge before that date of shortfalls in the simple IRA accounts. Rhoades' testimony was consistent with Walker's on most points, but where there was disagreement, the Court credits Walker, not Rhoades.

19. Walker had acted with reasonable diligence in his corporate oversight before May 2001, but inflated reports from his financial officer prevented him from having an accurate understanding of WAR's financial condition.

20. Immediately after learning in May 2001 of WAR's financial distress, Walker borrowed approximately $36,000 from his father, deposited it in WAR's bank account, and saw to it that the delinquent payroll taxes were paid.

21. Between May 18, 2001 and June 28, 2001, when WAR filed for bankruptcy, Walker handled company funds and wrote checks from the company account to pay various creditors. He did not draw a salary. At the same time, he failed to use any of the money in the general account to fund the shortfalls in the Plan.

22. Walker acted in good faith at all relevant times, even after learning of the company's financial problems and that the Plan was underfunded.

23. The amount of employee contributions withheld by the company but, at Rhoades' instruction, not forwarded to the custodial trustee totals $18,710.99.

**Conclusions of Law**

24. This Court has jurisdiction over the subject matter and the parties to this action pursuant to sections 505 and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132 and 1145, and § 301(a) of the Labor Management Relations Act, as amended, 29 U.S.C. § 185(a).

25. The Plan is an employee benefit plan within the meaning of section (3) of ERISA, 29 U.S.C. § 1002(3).

26. No part of the Secretary's cause of action is barred by the statute of limitations applicable to claims under ERISA.

27. The withheld employee contributions that remained in WAR's general account between May and July 2001 represented Plan assets within the meaning of ERISA, 29 U.S.C. § 1103(a) and regulations established under ERISA, 29 C.F.R. § 2510.3-102(a). *See also Phelps v. C.T. Enterprises, Inc.*, 394 F.3d 213, 220 (4th Cir. 2005).

28. Prior to May 18, 2001, Terry Rhoades served as the designated fiduciary and was the only individual at WAR who functioned as a fiduciary within the meaning of ERISA.

29. After May 18, 2001, the division of responsibility between Walker and Rhoades was effectively dissolved by Rhoades' admission to Walker that he had provided misleading financial information and that employee contributions were underfunded. Thereafter, Walker acted as a fiduciary as defined by ERISA and by operation of law when he exercised authority and control with respect to the management and disposition of the Plan assets that were commingled in the general corporate account. 29 U.S.C. § 1002(21)(A).

30. After May 18, 2001, Walker violated his fiduciary duty of undivided loyalty by failing to segregate past employee contributions from WAR assets, failing to remit employee contributions to the Plan, and using Plan assets for the benefit of WAR as opposed to Plan participants and beneficiaries. 29 U.S.C. §§ 1104(a)(1), 1106(a)(1)(D), 1106(b)(1).

31. Walker is personally liable for $18,710.99, representing the amount of contributions withheld from employee earnings but not remitted to the Plan between September 1999 and May 2001. 29 U.S.C. § 1109(a).

32. Plaintiff is not entitled to a permanent injunction prohibiting Walker from serving as a fiduciary or having control over the assets of an employee benefit plan in the future, because Walker did not engage in the type of egregious misconduct or self-dealing that warrants such a remedy. *See Beck v. Levering*, 947 F.2d 639 (2d Cir. 1991). Walker acted with reasonable diligence in his corporate oversight. On May 18, 2001, when the true financial picture of WAR began to be revealed by Rhoades, Walker undertook immediate action to determine the extent of WAR's debt and whether bankruptcy could be avoided. He put more money into the company and took none out for salary or other personal use. He soon determined that the company was hopelessly insolvent.

33. The Court, in its discretion, and in light of the unusual circumstances of this case as shown by the Court's findings, declines to award prejudgment interest to Plaintiff. *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030 (4th Cir. 1993). Postjudgment interest is awarded at the rate specified under 28 U.S.C. § 1961.

## Discussion

The statutory basis for a suit claiming breach of fiduciary duty under ERISA is 29 U.S.C. § 1109. Section 1109 (a) imposes personal liability on any fiduciary who breaches "any of the responsibilities, obligations or duties imposed upon fiduciaries" by

-7-

ERISA. A civil action may be brought "by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief." 29 U.S.C. § 1132(a)(2). Where there is more than one fiduciary, they may be held jointly and severally liable for breaches of the duties imposed by ERISA. *Id.* § 1109.

The critical question in this case is whether Walker was a fiduciary of the Plan. In order to acquire fiduciary status under ERISA, a party must (1) be named as a fiduciary in the instrument establishing the plan; (2) be named as a fiduciary pursuant to a procedure specified in the plan instrument; or (3) fall within the statutory definition of fiduciary. *See Darcangelo v. Verizon Commc'n, Inc.*, 292 F.3d 181, 192 (4th Cir. 2002). It is appropriate for a company, regardless of its size, to delegate to a particular individual or individuals the role of plan fiduciary. Indeed, ERISA requires every employee benefit plan to "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

ERISA defines a "named fiduciary" as a fiduciary who is named or identified as a fiduciary by an employer or employee organization with respect to the plan. *Id.* § 1102(a)(2)(A). Walker was not a named fiduciary under the Plan. All financial issues, including payroll and Plan administration, were clearly and fully delegated to Terry Rhoades. Walker's status as President and CEO, standing alone, does not make him a fiduciary of the Plan. Further, the fact that Walker's name appeared on the company checks and Walker had access to and authority over the company account does not, by itself, create

-8-

fiduciary status. *See Confer v. Custom Eng'g Co.*, 952 F.2d 34, 37 (3d Cir. 1991); 29 C.F.R. § 2509.75-8.

Nevertheless, even someone who is not a "named" fiduciary may assume fiduciary duties and become exposed to liability for breach of a fiduciary duty under ERISA. An individual may become a fiduciary under ERISA by exercising discretionary authority over plan assets. 29 U.S.C. § 1002(21)(A). Section 1002(21)(A) provides that a person is a fiduciary with respect to a plan to the extent that (I) he exercises any discretionary authority or discretionary control respecting management of the plan or respecting management or disposition of plan assets; (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of such plan or has any authority or responsibility to do so; or (iii) he has any discretionary authority or responsibility in the administration of the plan. *Id*.

Using plan assets to pay expenses of the company or for other non-plan purposes has been found to represent the exercise of authority and control respecting the management or disposition of plan assets.[2] Applying this standard, the evidence leads to the inescapable conclusion that, after May 18, 2001, Walker acted as a fiduciary of the Plan. As of that date, the prior division of responsibility, under which Rhoades was the sole fiduciary, was

---

[2]It is undisputed that the unremitted employees' contributions were plan assets governed by ERISA. *See* 29 C.F.R. § 2510.3-102(a). Every payroll WAR withheld funds from its employees' earnings, which became Plan assets but remained in the corporate account. The critical issue here is whether Walker acted as a fiduciary when he used Plan assets to pay Company creditors rather than forwarding those assets to the fund.

dissolved. Walker could no longer reasonably rely on the division of duties made in 1999, and he assumed financial control over the company. After learning on or about May 18, 2001 that the company had not remitted some withheld contributions to the custodial trustee, Walker placed money into the general account and wrote checks to the Internal Revenue Service and other creditors from that account. In doing so, he spent for the corporation's benefit more than the amount of the Plan assets in the general account.

The Court finds nothing to indicate that Walker acted with an improper motive or in bad faith. However, the fact that a fiduciary has acted in subjective good faith is not a defense once a breach is established. *See Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984); *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983); *Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982). ERISA casts a very broad net in its functional definition of fiduciary, and Walker's actions after May 18, 2001 place him within that net. The Court notes, however, that this ruling does not extend fiduciary status to every person who exercises mere possession or custody over plan assets, or who has signatory authority over such assets. Walker became more than a mere custodian when the division of duties he had created and observed was destroyed, and when he paid creditors out of the general account without first segregating or remitting to the custodian that part of the account that represented withheld employee contributions.

ERISA places a number of obligations on a fiduciary. First, a fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and

-10-

beneficiaries and . . . for the exclusive purpose of . . . (I) providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(A)(1). Second, a fiduciary is required to discharge these duties "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(B). Finally, a fiduciary must not "deal with the assets of the plan in his own interest or for his own account," 29 U.S.C. § 1106(b), but rather must take appropriate steps to assure that "the assets of a plan shall never inure to the benefit of any employer." 29 U.S.C. § 1103(c)(1). In drafting ERISA's standards of fiduciary conduct, Congress invoked the common law principle of trust and traditional trust principles. *NLRB v. Amax Coal Co.*, 453 U.S. 322, 332-33 (1981). These principles include "strict standards of trustee conduct, . . . most prominently, a standard of loyalty and a standard of care." *Cent. States, S.E. & S.W. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985). The Court finds that Walker breached his fiduciary duty after May 18, 2001 by commingling general funds and Plan assets, failing to segregate and pay to the fund Plan assets, and using Plan assets for purposes other than for the exclusive benefit of the Plan participants and beneficiaries.

Plaintiff requests damages representing the loss to the Plan, along with prejudgment interest. Under ERISA, a fiduciary who breaches his duty is personally liable to make good any losses the plan sustains as a result of his breach. It is undisputed that the loss to the Plan

-11-

includes the $18,710.99 in contributions withheld from employee earnings but not remitted to the Plan between September 1999 and May 2001. 29 U.S.C. § 1109(a). Plaintiff also seeks prejudgment and postjudgment interest on that amount.

Awards of prejudgment interest are discretionary under ERISA. *See Quesinberry*, 987 F.2d at 1030; *Kennedy v. Georgia-Pacific Corp.*, 31 F.3d 606, 611 (8th Cir. 1994); *Whitfield v. Lindemann*, 853 F.2d 1298, 1306 (5th Cir. 1988). Prejudgment interest "is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness." *Blau v. Lehman*, 368 U.S. 403, 414 (1962) (internal quotations omitted). It is not awarded as a penalty, but as compensation for the use of funds. *Quesinberry*, 987 F.2d at 1031. Plaintiff has not shown how the Plan in this case would have invested the funds or earned any specific rate of interest on its investments. *See Whitfield*, 853 F.2d at 1306-07. Moreover, considerations of fairness in this case do not support imposition of prejudgment interest on Walker. Walker was not a named or designated fiduciary and did not act in a fiduciary capacity prior to May 18, 2001. The loss to the Plan resulted primarily from the improper actions of Terry Rhoades between September 1999 and May 2001. Further, the Plan stands to make a full recovery of its losses plus prejudgment interest by reason of the consent judgment against Terry Rhoades in this action. The Court observes that the Plan and its participants appear to be protected and will be fully reimbursed under the consent judgment, inclusive of prejudgment interest. Under

-12-

the unusual circumstances of this case, the Court elects not to impose prejudgment interest upon Defendant Walker.

The court awards judgment against Wesley Walker in the amount of $18,710.99, plus postjudgment interest at the rate of 6.00% simple A.P.R., in accordance with 28 U.S.C. § 1961. Each party shall bear its own costs of litigation, including attorney's fees.

Plaintiff also seeks a permanent injunction prohibiting Walker from acting as an ERISA fiduciary in the future. Under ERISA § 1109, the court is authorized to fashion such equitable or remedial relief as it deems appropriate, including those developed under the law of trusts. 29 U.S.C. § 1109; *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110-11 (1989). Permanent injunctions are among the remedies available under the law of trusts. *Id.* Whether a permanent injunction is an appropriate remedy for breach of fiduciary duty depends on the nature of the misconduct. *See Beck v. Levering*, 947 F.2d 639, 641 (2d Cir. 1991). A permanent injunction might be appropriate, for example, where an individual engages in the type of self-dealing that is likely to be repeated. That is not the case here. While the Court finds that Walker became a fiduciary when the division of responsibilities between Walker and Rhoades was dissolved, and breached his fiduciary duty by using fund assets to pay general creditors, Walker did not act in bad faith or with improper motive. Walker's violation of ERISA has no significant likelihood of being repeated. Plaintiff's request for injunctive relief is denied.

A separate judgment will be entered contemporaneously with this Memorandum Opinion.

                                                         /s/ P. Trevor Sharp
                                                   United States Magistrate Judge

Date: April 13, 2006